**TENSAW LAND AND TIMBER CO., INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 195–84T.

United States Claims Court.

March 21, 1988.

On Reconsideration May 4, 1988.

David M. Wooldridge, Birmingham, Ala., for plaintiffs. Timothy A. Bush and Sirote, Permutt, McDermott, Slepian, Friend, Friedman, Held & Apolinsky, P.C., Birmingham, Ala., of counsel.

William C. Rapp, with whom were Asst. Atty. Gen. William S. Rose, Jr. and Mildred L. Seidman, Washington, D.C., for defendant.

OPINION

BRUGGINK, Judge.

. This tax refund action, filed pursuant to 28 U.S.C. § 1491(a) (1982), comes before the court on defendant's motion for partial summary judgment and plaintiff's cross-motion for partial summary judgment. The sole question addressed by these motions is whether plaintiff Tensaw Land and Timber Co., Inc. ("Tensaw") "held," on July 1, 1978, a certain stand of timber for more than one year, as required by Internal Rev-

enue Code ("I.R.C.") § 1222(3) (1982) [1] as a condition for obtaining long-term capital gain treatment on the sale or exchange of a capital asset. After consideration of the parties' submissions and oral argument, the court concludes that there are no material facts in dispute and that plaintiff is entitled to partial summary judgment as a matter of law on the holding period issue.[2]

## FACTUAL BACKGROUND [3]

Tensaw is an Alabama corporation with its principal place of business located in Mobile, Alabama. On November 26, 1956, Tensaw entered into an agreement with the St. Regis Paper Co. ("St. Regis") concerning approximately 57,000 acres of timberland owned by Tensaw and located in Mobile, Washington, and Clarke Counties, Alabama. On the same date, Washington Lumber and Turpentine Co. ("Washington Lumber") entered into a similar agreement with St. Regis, concerning approximately 34,000 acres of timberland in Mobile and Washington Counties.[4] The 1956 Agreements [5] were for a term of sixty years, or until the year 2016. During this period, St. Regis agreed to buy "all timber growing and to be grown on the land," subject to various terms and conditions set forth in the agreements. For example, in any one year, St. Regis could not cut (1) more than the average annual growth of timber or (2) an amount that would reduce the future annual growth below the minimum number of cords St. Regis was required to pay for annually.[6] Moreover, duties were imposed upon St. Regis to protect the continuing interest of Tensaw in the property and to preserve a stand of timber capable of sup-

porting indefinitely the full level of cutting provided under the contract: (1) St. Regis was required to manage and operate the lands and timber in accordance with good forestry practices. This included restocking areas cut or burned to ensure a full stand of timber and to ensure that the average annual growth in timber would not be less than that cut annually; (2) St. Regis was required to conduct its logging operations in a manner usual and customary in commercial logging operations and using "good forest practices," avoiding "unnecessary damage to the remaining timber"; (3) it was required to furnish Tensaw with a plan of its operations periodically, and to allow inspection; (4) it was required to keep books and records of its operations and to allow examination of them by Tensaw or its agents at reasonable times; and (5) it was required to make various payments for the benefit of the property, including expenses of operations, severance taxes, and ad valorem taxes on the land, timber, and improvements.

The land subject to the 1956 Agreements was densely planted timberland, and the parties expected the land to remain in a state of dense growth for the full term of the agreements. The surface of this land was capable of supporting only two practical activities: timber management (or farming) and hunting. The only rights retained by Tensaw under the 1956 Agreements were (1) to enter the land to obtain oil and gas, so long as it did not interfere with the St. Regis timber operation, and (2) to enter and leave the land for purposes of

---

1. Unless otherwise indicated, all references are to the Internal Revenue Code of 1954, as amended.

2. As explained in more detail below, the court has made no determination as to the character of the income received by Tensaw in 1978 as a result of its alleged sale of timber. Whether the timber sold was a capital asset held by Tensaw, as defined by I.R.C. § 1221, thus remains an open question.

3. The information set forth in this section derives from the parties' undisputed proposed findings of uncontroverted fact as well as from documents that accompanied the motions.

4. On August 31, 1959, Washington Lumber was merged with Tensaw, such that under Alabama law Tensaw succeeded to all rights, title, interest, and obligations of Washington Lumber. Accordingly, the two agreements entered into on November 26, 1956 will hereafter be referred to collectively as "the 1956 Agreements."

5. The relevant provisions of the 1956 Agreements are contained in an appendix to this opinion.

6. The only exceptions to these restrictions related to extraordinary cutting due to fire and cutting of timber purchased during the first ten years of the sixty-year agreements.

reviewing St. Regis' operations. In addition, pursuant to a Hunting Letter Agreement dated November 26, 1956, St. Regis granted certain individuals (officers/shareholders of Tensaw and their families) all hunting and fishing rights on the land, subject to several conditions not relevant here. At termination of the 1956 Agreements, St. Regis agreed to surrender all of the rights in the land and timber previously granted it by Tensaw.

The 1956 Agreements were never recorded in the Office of the Probate Judge for any of the counties in which the subject timberland was located, a requirement under Ala.Code § 35–4–6 (1975) for leases with terms greater than twenty years. Section 35–4–6 provides:

> No leasehold estate can be created for a longer term than 99 years. Leases for more than 20 years shall be void for the excess over said period unless acknowledged or approved as required by law in conveyances of real estate and recorded within one year after execution in the office of the judge of probate in the county in which the property leased is situated.

Consequently, in 1976 a dispute arose between Tensaw and St. Regis concerning the continuing validity of the 1956 Agreements after November 26, 1976. In a letter dated September 7, 1976, Dewitt Reams, counsel for Tensaw, wrote to Homer Crawford, Secretary of St. Regis: "Tensaw has asked us to examine the question of whether or not the agreements between Tensaw ... and St. Regis are leases. We have made a careful examination of the available authorities and have reached the conclusion that the documents are leases." After referring to Ala.Code § 35–4–6, Reams stated, "Under the above circumstances, it is the position of Tensaw ... that these leases will terminate on November 26, 1976, and that the time beyond that date provided for in the leases is void as stated in [section 35–4–6]."

On November 19, 1976, a conference between officials of Tensaw and St. Regis was held at the offices of St. Regis in New York City. Following this conference, Reams and Crawford exchanged letters setting forth the parties' understandings with respect to the continuing conduct of St. Regis and Tensaw after November 26, 1976. Crawford's letter, dated December 2, 1976, states:

> It is my understanding that you and I concluded [at the November 19th meeting] that neither of the parties to these Agreements were to be prejudiced in any way by reason of the fact that the parties are giving consideration to entering into new agreements which would presumably replace the current Agreements or, if you prefer, the Agreements which were in effect at least until November 26, 1976.
>
> On the side of your clients [sic] position in the matter our understanding would not preclude them from asserting that the Agreements between them and us came to an end on November 26, 1976 on the grounds that the said Agreements represented leases of real property which were not recorded in accordance with the requirements of the Alabama statutes. At the same time from our standpoint, our continued operation in accordance with the Agreements would not place us in jeopardy of being charged with trespass or the violation of the property rights of others. In short, Dewitt, it is my understanding that we are in agreement and that you and your clients are in the same position vis a vis your claim that the Agreements between us are leases as you were on or before November 26th and your failure to make formal assertion of that position with the intention to terminate our rights to operate under the Agreements after November 26th is preserved and conversely by continuing our operation we are not incurring liabilities other than those represented by our obligations under the Agreements.
>
> Our understanding is that the status quo is maintained between the parties without prejudice to the rights of either as those rights might be circumscribed by the passage of any particular chronological point in this case, presumably November 26, 1976.

On December 10, 1976, Reams responded to Crawford's letter:

> Thank you for your letter of December 2nd. I agree with the positions expressed in your letter in regard to St. Regis. . . .
>
> It is my understanding that your statement of positions may be summarized as saying that each of us agree that until further notice the rights and obligations of each will continue to be the same after November 26, 1976 as they were prior to that time, and that the making of this special agreement does not in any way prejudice the rights or position of either party in regard to whether or not the agreements terminated on November 26, 1976. This agreement of extension may be terminated by either party at any time by written notice to the opposite party.
>
> I hope we will soon be able to start working on the details of finalizing a new agreement between the parties.

On May 30, 1978, the trustees of the Boykin Family Trust (which held all of Tensaw's voting stock) held a meeting to discuss the continuing negotiations with St. Regis. At the meeting, Reams told the stockholders:

> Notice of the failure to record and its consequences was given to St. Regis prior to the expiration of the lease in November of 1976, and in a meeting between the officers of Tensaw and the President and some of the other officers of St. Regis in New York in November of 1976, it had been agreed that negotiations would be carried on to work out a new agreement if it were possible. It also was agreed that payment should continue and St. Regis' operation should continue the same during the negotiations as if the agreement were in full force and effect, except that either party could terminate the continuation agreement if the party desired to do so.

Accordingly, St. Regis continued to cut timber between 1976 and 1978 pursuant to this arrangement while the parties negotiated on the terms of a new agreement. On July 1, 1978, St. Regis and Tensaw executed three separate documents to supplant the continuation agreement. One was a timber deed, the second was a fifty-year lease, and the third was entitled "Agreement." [7] The "Agreement" provided as follows with respect to the 1956 Agreements:

> NOW, THEREFORE, in consideration of the premises and in order to avoid litigations of the claims of Tensaw, eliminate the respective liabilities and obligations of the parties under the 1956 Agreements, and to permit the completion of negotiations of a new agreement mutually beneficial to the parties, the parties hereby stipulate that said Agreements of November 26, 1956, are terminated and each does hereby release and discharge the other from any and all claims, actions or causes of action which either may have against the other which in any way have arisen or which may arise out of said Agreements of November 26, 1956.

Under the timber deed, St. Regis agreed to pay Tensaw $7,507,404 for "such volumes of merchantable timber as will yield 625,617 cords of pulpwood at the time said timber is cut, and which timber is now or hereafter standing and being on that certain parcel of property more specifically described in Exhibit 'A' hereto attached." A $507,404 payment was to be made at the time of execution, with the remaining $7,000,000 due Tensaw on October 1, 1979. Under the deed, St. Regis had a period of twenty years from July 1, 1978 to cut and remove the 625,617 cords of pulpwood.

The fifty-year timber lease established the lessee's rights and duties regarding the use of the land, including a rental rate of at least $9.00 per acre per year. Under the lease, St. Regis was given the exclusive right, subject to certain reservations, to:

> A. Use the Lands for the production of, and the cutting, storing, removing and

---

7. Because this opinion is limited to the holding period question and, consequently, does not address the characterization of the income received by Tensaw under the 1978 Agreements, the terms of these agreements are largely irrelevant. Nevertheless, the court will provide a general description of these agreements for background purposes.

selling and utilization of all timber, trees and pulpwood now growing and which may hereafter grow upon the Lands during the term of this Lease and for the production, utilization, and sale of all logs, woods, turpentine and naval stores thereon and therefrom. . . .

On its federal income tax returns for calendar years 1974 through 1979, Tensaw reported its receipts from St. Regis as long-term capital gain. On audit, the Commissioner of Internal Revenue determined that the payments should have been reported as ordinary income, and assessed deficiencies in accordance with that conclusion. Tensaw paid these deficiencies and filed claims for refunds for the years in issue.[8] Because more than six months elapsed after the filing of these claims without a decision by the Secretary of the Treasury, Tensaw filed its complaint here on April 16, 1984, pursuant to I.R.C. §§ 6532 and 7422, and 28 U.S.C. § 1491.

## DISCUSSION

The pending cross-motions for summary judgment relate only to the tax years 1978 and 1979. The sole question currently before the court is whether Tensaw maintained a holding period for more than one year in the timber it allegedly sold to St. Regis on July 1, 1978 ("the timber"). The court thus expresses no opinion on the availability of long-term capital gain treatment for the income received by Tensaw under the 1978 Agreements. The availabil-

ity of such treatment, absent settlement by the parties, will be determined at a later date. The court defers this determination primarily because of the parties' representation that once the holding period issue is decided, the parties will likely settle all remaining matters.

As explained below, the court finds that Tensaw "held" the timber from November 19 or December 10, 1976 until July 1, 1978, or for approximately nineteen months. Under the terms of the 1976 continuation agreement[9] between Tensaw and St. Regis, Tensaw possessed sufficient incidents, or burdens and benefits, of ownership to justify the conclusion that it held the timber until July 1, 1978, when a new long-term agreement was reached by the parties. The court's determination regarding Tensaw's holding period in the timber does not depend on the characterization of the 1956 Agreements as either leases or licenses, or on the applicability of Ala.Code § 35–4–6;[10] whether the agreements constituted leases that became void on November 26, 1976 pursuant to section 35–4–6, or licenses that continued in force until modified or terminated by the parties, the result here is the same.

In December 1976 at the latest, the parties entered into a temporary "agreement of extension" to have the 1956 Agreements continue in force, with one significant modification, until such time as a long-term arrangement could be reached.[11] The mod-

---

**8.** The claims were filed on September 15, 1983.

**9.** The court uses the terms "continuation agreement" and "extension agreement" interchangeably in this opinion. The parties have used both terms to refer to the agreement.

**10.** Tensaw argues that the 1956 Agreements, which were never recorded, constitute sixty-year leases that became void on November 26, 1976 (twenty years after the agreement between Tensaw and St. Regis was executed) by operation of Alabama Code § 35–4–6 and that the timber leased to St. Regis "reverted" to Tensaw on this date, thus beginning Tensaw's holding period in the timber. Defendant argues that the 1956 Agreements constitute licenses and that § 35–4–6 is therefore inapplicable; thus, the timber never "reverted" to Tensaw. Because the court concludes that the 1976 continuation agreement between the parties independently

provided Tensaw with the requisite holding period in the timber, a resolution of the above arguments is unnecessary. *See infra* note 13.

**11.** If, as Tensaw argues, the 1956 Agreements became void on November 26, 1976 pursuant to Ala.Code § 35–4–6, then this "extension agreement" constituted a new agreement between the parties. If, however, the 1956 Agreements constituted licenses that did not become void on November 26, 1976, then the extension agreement was simply a modification of the previous written contract. *See infra* note 12. In either case, the rights and obligations of the parties changed as a result of the extension agreement; Tensaw would thus have a holding period in the timber—for the reasons stated herein—under either interpretation. For simplicity's sake, the court will refer to the extension agreement as entailing a modification of the 1956 Agreements.

ification, as expressed in the December 10, 1976 letter from Dewitt Reams to Homer Crawford, gave each party the power to terminate the extension agreement "at any time by written notice to the opposite party." The court concludes that this modification, whether it was made orally on November 19, 1976, as defendant argues, or through the exchange of letters in December 1976,[12] in conjunction with (1) the short term nature of the extension agreement and (2) several other provisions in the 1956 Agreements, gave Tensaw sufficient burdens and benefits of ownership to constitute a holding period in the timber through July 1, 1978.[13]

In *McFeely v. Commissioner*, 296 U.S. 102, 107, 56 S.Ct. 54, 56, 80 L.Ed. 83 (1935), the Supreme Court commented, "In common understanding, to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding." The passage of legal title is not required, however. *See Boykin v. Commissioner*, 344 F.2d 889, 891, 893 (5th Cir.1965); *Merrill v. Commissioner*, 40 T.C. 66, 74 (1963), *aff'd per curiam*, 336 F.2d 771 (9th Cir.1964). The court must

take a practical look at the transaction even though through law colored glasses —at what the parties did—and from that reach a decision as to whether the Taxpayer in question possessed sufficient of the accouterments of ownership—usually styled the benefits and burdens—to justify the conclusion that he "held" the property in excess of [one year].

*Boykin*, 344 F.2d at 893; *see also Stanley v. United States*, 436 F.Supp. 581, 583 (N.D.Miss.1977), *aff'd per curiam*, 599 F.2d 672 (5th Cir.1979); *Hoven v. Commissioner*, 56 T.C. 50, 55 (1971).

The combination of several specific factors indicates that Tensaw possessed sufficient burdens and benefits of ownership in the subject timber during the term of the extension agreement to establish a holding period. First, because either party could cancel the extension agreement at any time, Tensaw bore both the risk of loss and the opportunity for gain in the timber. If, for example, the value of the timber fell below the price that St. Regis was required to pay Tensaw, St. Regis would no doubt have immediately terminated the agreement (taking into account transaction costs). If, however, the value of the timber increased to any point above the price that St. Regis was required to pay Tensaw, then

**12.** Under Alabama law, "a written agreement can be modified by a subsequent oral agreement unless some statutory provision requires otherwise." *Hall v. Integon Life Ins. Co.*, 454 So.2d 1338, 1343 (Ala.1984); *see also Winegardner v. Burns*, 361 So.2d 1054, 1057 (Ala.1978); *Goodwin v. Hall*, 275 Ala. 297, 154 So.2d 654, 656 (1963); *cf. Watson v. McGee*, 348 So.2d 461, 464 (Ala.1977) ("Parties to a written contract may by mutual consent without other consideration orally alter, modify or rescind the contract."). Assuming that the 1956 Agreements constitute leases and, consequently, that any modification to the agreements would have to be in writing under the Alabama Statute of Frauds provision, Ala.Code § 8–9–2 (1984), then arguably the modification would not have become effective until December 1976. *But see Levy v. Allen*, 257 Ala. 326, 58 So.2d 617, 622 (1951) ("The object of the statute of frauds is to protect individuals from having parol agreements imposed on them against their consent; but it has been uniformly held not to defeat a parol contract which is afterwards evidenced by a writing signed by the party sought to be charged with it."). If the 1956 Agreements constitute licenses, then the modification would have been effective on No-

vember 19, 1976, assuming that an oral agreement to modify the original contract was reached by the parties at the meeting in New York City. In any event, it is clear that the modification—to have the 1956 Agreements continue in force with the mutual right of the parties to terminate upon notice to the opposite party—was reached more than one year before the new long-term agreement was signed on July 1, 1978.

**13.** Both parties argue that the timber must have "reverted" to Tensaw at some point in 1976 (assuming no holding period between 1956 and 1976) as a prerequisite to the establishment of a holding period in the timber. In other words, Tensaw must have acquired the timber from St. Regis in 1976 to begin its holding period. *See McFeely v. Commissioner*, 296 U.S. 102, 107, 56 S.Ct. 54, 56, 80 L.Ed. 83 (1935). The court concludes that the inherent nature of the modification made in November or December 1976 and the substance of the continuation agreement gave Tensaw its holding period in the timber, thus indicating that the timber, in effect, "reverted" to Tensaw whenever the modification became effective.

Tensaw would have immediately terminated the agreement. Accordingly, Tensaw possessed both the up- and down-side risk of changes in the value of the timber, a clear "accouterment of ownership."

Second, the parties intended the extension agreement to remain in force only until a new, long-term agreement could be negotiated. The short-term nature of the extension agreement is evidenced by references to the November 19, 1976 meeting in New York City [14] and, more concretely, by the fact that the parties negotiated and entered into a new long-term arrangement within less than two years. Consequently, Tensaw would either recover complete possession of the timber in a relatively short period of time,[15] or, as the result of negotiations, it would enter into an entirely new agreement concerning the long-term disposition of the timber. Tensaw thus retained a significant interest in the specific timber that was standing in November/December 1976. The short-term nature of the extension agreement guaranteed that Tensaw would control disposition of the vast majority of this standing timber. As defendant conceded during oral argument in discussing the establishment of a holding period in timber towards the end of the sixty-year 1956 Agreements:

> [I]t may be that ... during the last years of the contract, Tensaw is necessarily acquiring a holding period....
>
> If we look at it 12 months before the end of the 60 years, an important sense is not all of that timber is now—not all of that timber still belongs to St. Regis. They are not permitted to go out and clearcut all the timber. So, they can't get it all and sell it all.
>
> On the other hand, not all of that timber is certainly going to be—going to end up belonging to Tensaw, because some of

it's going to be cut by St. Regis in that year.

> THE COURT: But by definition, isn't any tree that's standing on the day the termination of the term of the contract—whatever that tree is, it obviously didn't appear that instant.
>
> MR. RAPP: That's right. And so that's why I suggest that perhaps with holding period, at the end of the contract what's happened is there's been a gradual acquisition of some of the timber by Tensaw as the end of the contract approached.

Transcript at 60–61. By analogy, in a short-term arrangement such as the continuation agreement between Tensaw and St. Regis, Tensaw held the timber it eventually sold (on July 1, 1978) since the effective date of the agreement.

Third, Tensaw retained legal title to all standing timber; title passed to St. Regis only after the timber was cut. *See* 1956 Agreements ¶ 15 (contained in the appendix). Although this arrangement might have been for security purposes, it does not change the fact that Tensaw had legal title to the timber—an important incident of ownership.

Finally, Tensaw reserved access to the timberlands for surveys, timber cruises, and inspections of St. Regis' operations. Tensaw also was given the right to examine St. Regis' books and records relating to the timber operations and to the management of the lands. *See* 1956 Agreements ¶¶ 5, 8 (contained in the appendix). These contract provisions provide additional evidence that Tensaw had retained a significant ownership interest in the standing timber. Through inspection of St. Regis' operations and examination of the books and records, Tensaw could ensure contract compliance and, therefore, the continuing vitality of the timber and the forest lands.

**14.** According to the December 2, 1976 letter from Homer Crawford to Dewitt Reams, and the minutes of the May 30, 1978 meeting of the trustees of the Boykin Family Trust, the parties agreed at the November 19, 1976 meeting to begin negotiations for a new agreement. Although no deadline was set on the negotiations, the expressed purpose was to reach a settlement on a new agreement as quickly as possible to avoid litigation. *See also supra* text following note 7 (the "Agreement" executed on July 1, 1978).

**15.** Tensaw would recover the timber standing in November/December 1976, less any trees cut by St. Regis in the interim.

Admittedly, St. Regis also possessed certain burdens and benefits of ownership during the term of the extension agreement. It had the right to cut a certain amount of trees, as limited by several provisions in the 1956 Agreements. St. Regis paid all severance taxes, ad valorem taxes on the land, timber, and improvements, and the expenses of timber cutting operations. Finally, St. Regis was in possession of the standing timber and the timberlands, and could use (or build) all improvements on the land necessary to its timber cutting operations. *See* 1956 Agreements ¶¶ 10, 11 (contained in the appendix). Nevertheless, these factors, relative to the burdens and benefits of ownership possessed by Tensaw, are insufficient to provide St. Regis with a holding period in the standing timber (sold on July 1, 1978) during the term of the extension agreement.

In discussing the impact of the extension agreement on the parties' relationship, defendant states in its initial brief: "It is clear that transformation of the relationship between Tensaw and St. Regis from one based on a binding, long-term contract, to one best described as a tenancy at sufferance, substantially altered the burdens and benefits as between the two with respect to the timber." Although the arrangement between Tensaw and St. Regis under the extension agreement might better be described as a temporary tenancy at will,[16] the court agrees with defendant's assessment. It supports the above conclusions regarding Tensaw's holding period in the timber. The court does not agree, however, with defendant's argument that Tensaw merely had an option to cancel the extension agreement and, consequently, could only establish a holding period in the timber if it exercised that option, which it plainly did not do. It is clear, however, that the modification made by Tensaw and St. Regis in November or December 1976 did not constitute an option. The nature of the contract modification—to have the 1956 Agreements continue in force with the mutual right of the parties to terminate upon notice to the opposite party—establishes that an option was not created. *Either* party could have terminated the agreement; an option implies that *one* party has been given certain rights by the other party. *See United States Freight Co. and Subsidiaries v. United States,* 190 Ct.Cl. 725, 738–39, 422 F.2d 887, 894 (1970) (defining an "option").

## CONCLUSION

For the reasons expressed above, the court concludes that Tensaw had sufficient "accouterments of ownership" under the specific terms of the extension agreement such that its holding period in the timber that was sold to St. Regis on July 1, 1978 exceeded one year.[17] Defendant's motion for partial summary judgment is therefore denied and plaintiff's cross-motion for partial summary judgment is granted insofar as the holding period issue. On or before April 5, 1988, the parties shall jointly submit to the court a proposed date for the pretrial conference or, if no trial is necessary, a joint status report indicating the parties' positions on settlement.

It is so ORDERED.

## APPENDIX

1. A. Seller hereby agrees to sell to Purchaser and Purchaser hereby agrees to buy from Seller during the term beginning December 29, 1956, and continuing until December 31, 2016, unless sooner terminated as hereinafter provided, all timber growing and to be grown on the land in Mobile, Baldwin, Washington and Clarke Counties, Alabama, ... containing 57,394 acres, more

---

**16.** A "tenancy at will" is defined as "a tenancy of no fixed period that endures so long as both landlord and tenant desire." J. Dukeminier & J. Krier, *Property* 135 (1981). As stated above, however, the parties envisioned the extension agreement to be in effect for only a temporary period until a new long-term arrangement could be negotiated.

**17.** The court thus need not reach the question of whether Tensaw held the timber under the 1956 Agreements. *Cf. Superior Pine Prods. Co. v. United States,* 201 Ct.Cl. 455, 481, *cert. denied,* 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973).

or less, upon the terms and conditions hereinafter set out....

B. The Purchaser, if not in default with respect to any payments required to be made under the provisions of Paragraph 2 B, 4, 5, and 7 hereof, is hereby granted the right to terminate this agreement on December 31st of any of the following years: 1977 and 1978 by giving written notice of termination to the Seller not less than twelve months prior to the date specified in such notice as date of termination and upon such date of termination, notwithstanding any provision of this agreement to the contrary, all of the rights, privileges, obligations and licenses of the parties hereto, shall cease and terminate and both parties thereafter shall be released from the terms, provisions and obligations imposed upon them hereunder....

2. A. Seller has agreed to sell and deliver for cutting, removal and utilization and Purchaser has agreed to buy and accept delivery (for cutting, removal and utilization) on December 29, 1956, of one hundred twenty-one thousand, three hundred (121,300) cords of pine pulpwood now growing and hereafter growing on the lands described in Exhibit "A" hereof, at and for a purchase price of $7.00 per cord, payable on or before said date, and the Purchaser thereafter shall have the right to enter, cut and remove said pulpwood (in addition to any other amounts of pulpwood which it is authorized to cut, remove or utilize hereunder) at any time during the term of this agreement, and notwithstanding the provisions of Paragraph B hereof, the purchase price payable therefor shall not be subject to adjustment and is definite, fixed and unchangeable....

B. Purchaser, on and after January 1, 1957, shall buy, cut and remove or otherwise utilize said timber (in addition to the timber purchased under subparagraph A hereof) in the amounts hereinafter more specifically set out during each year of the term of this agreement and Purchaser, subject to the provisions hereinafter contained shall pay to Seller as the purchase price of said timber (other than the pulpwood purchased under subparagraph A hereof)

bought, cut and removed, or otherwise utilized hereunder, the sum of $4.00 per cord of pulpwood....

. . . .

4. A. The Purchaser, on or before December 29, 1956, shall pay to Seller Eight Hundred Forty-nine Thousand, One Hundred and no/100 ($849,100.00) Dollars as the purchase price of 121,300 cords of pine pulpwood, and commencing in the year of 1957, and thereafter during each of the years included in the periods indicated in Column 1 the Purchaser, subject to the provisions and limitations of this agreement, and unless excused from so doing by reason of the provisions of Paragraph 18A or 18B, if Option (2) of 18B is exercised, shall pay to the Seller, quarter-annually, on the first day of January, April, July and October of such years, one-fourth of the purchase price of the number of cords indicated in Column 2 opposite the year concerned:

| Column 1 | Column 2 |
|---|---|
| 1957 to 1966, inclusive | 15,164 Cords of Pulpwood |
| 1967 to 1976, inclusive | 30,328 Cords of Pulpwood, and from |
| 1977 to 2016, inclusive | 42,448 Cords of Pulpwood; |

provided, however, the payments made prior to December 31, 1957, shall not purchase any pulpwood for cutting, removal or utilization now growing or hereafter growing on the lands described on Exhibit "B", but payments made subsequent to December 31, 1957 shall be applied to the purchase of pulpwood now and hereafter growing on said lands....

During the year of 1962 and periodically each fifth year thereafter, a forest survey shall be made and completed and an estimate of the anticipated average annual growth or reproduction of pulpwood (which shall include all timber) on said lands and the amount thereof which the Purchaser in the exercise of good forest practices may cut and remove therefrom (which said survey shall hereinafter be called "cruise"), shall be made by the Purchaser at its expense....

B. Should Purchaser, during any one or more calendar years hereafter not cut, remove or otherwise utilize timber in the amount for which Purchaser is required to

pay in any such year, then Purchaser shall be entitled to cut, remove or otherwise utilize, during the subsequent years, the quantity of timber so paid for but not cut, removed or otherwise utilized in prior years, which said quantity (sometimes herein called "timber backlog" or "backlog") shall be determined or based upon the purchase price hereunder of a cord of pulpwood during the year in which the prepayment is made, but the Purchaser shall not in any subsequent year cut, remove, or otherwise utilize any quantity of timber for which prepayment has been made hereunder unless Purchaser shall also pay all amounts due and payable hereunder for the current year as and when due, and Purchaser, for the purpose of reducing the amount of the timber backlog, (except as otherwise provided in subparagraph D hereof and Paragraphs 7A or 7C hereof), shall not cut or remove pulpwood from the land to an extent which will reduce the average annual growth of timber during that and future years to be an amount that is less than the minimum amounts for which payments must be made during any such year and the succeeding years concerned. If Purchaser shall not cut, remove or otherwise utilize the full quantity of timber for which prepayment shall have been made hereunder prior to the expiration of this agreement or expiration of any renewal or extension thereof, or the termination of this agreement pursuant to the provisions of Paragraph 14 hereof, whichever is the shorter of said periods, then the right of Purchaser to cut, remove or otherwise utilize all or any part of the timber for which prepayment shall have been made shall terminate, and the Seller shall retain the amount of such prepayment and shall not be under any obligation to the Purchaser with respect thereto.

. . . .

D. It is agreed and understood that any limitations or provisions of this agreement to the contrary notwithstanding, the Purchaser, if not in default with respect to any payments required to be made under the provisions of Paragraphs 2, 4, 5, and 7, shall have the unqualified and unrestricted right, without regard to the average annual growth of timber on the land, to cut, remove or otherwise utilize pulpwood in the amount purchased and for which payment is made to the Seller in the years of 1956 to 1966, inclusive, and this right may be exercised even though it may reduce the average annual growth (computed on the stand of timber from which the backlog has been deducted) of timber that may be cut or removed according to good forest practices, to an amount that is less than the minimum amounts for which payment must be made during any such year and the succeeding years concerned. It is the intent of this provision that the right to remove the timber purchased during the years above specified shall in no wise be regulated or limited by the average annual growth of timber on the land.

5. ... [C]ommencing with the year of 1977 the Purchaser shall have the right to cut and remove and otherwise utilize annually, 42,448 cords of pulpwood or, the number of cords of pulpwood estimated to be grown annually by the most recent cruise made hereunder, whichever is greater, during each succeeding calendar year of the term of this agreement, provided that said amounts shall be subject to increase at any time during this agreement as hereinafter provided, and, after 1976 the authorized annual cut above specified may be decreased as herein provided. If during the last period specified above (which commences in 1977), the average annual growth or reproduction of the timber upon said lands falls below the said 42,448 cords of pulpwood or the number of cords of pulpwood estimated to be grown annually by the most recent cruise made hereunder, then the amount of timber which Purchaser (except as otherwise provided in Paragraphs 4D and 7 hereof) shall have the right to cut and remove or otherwise utilize shall be reduced to the amount of such average annual growth or reproduction; nevertheless the minimum annual amounts which Purchaser shall be required to pay under Paragraphs 2A and 4A hereof during the years of the last period above specified, unless excused by the provisions of Paragraph 18A, or 18B, if Option (2) of 18B is

exercised, shall not be reduced to less than the purchase price of 42,448 cords.... Purchaser shall furnish Seller, before the beginning of each calendar year, a copy of its plan for such year's operation and shall conform to such plans to the extent circumstances permit, and shall give written notice to Seller of any substantial changes in or departures from such plans. Said plans or any changes therein or departures therefrom shall not, however, operate as amending or modifying any of the terms of this agreement. Seller shall have access to the land for any and all purposes not inconsistent with the terms and provisions of this agreement, including inspections, surveys and cruises.

5. A. Purchaser covenants and agrees that it will, at its expense at all times during the term or life of this agreement, manage and operate said lands and the timber thereon in accordance with good forest practices from time to time prevailing, including but not limited to, the restocking of areas cut or burned, and with such fire protection as good forest practice requires, in such manner that the average annual growth or reproduction shall not be less than the amount of timber cut and removed or otherwise utilized annually....

The amount of timber cut and removed or otherwise utilized during the term of this agreement from the tract as a whole, except as otherwise provided in Paragraph 4D hereof, and for which Purchaser is obligated to pay Seller under the provisions of this agreement, shall not exceed the growth or reproduction of timber on the tract as a whole during the entire term of this agreement and any extension thereof....

....

8. Purchaser shall keep accurate and detailed books and records in regard to its timber operations hereunder, the management, control, use and reforestation of said lands and the timber cut and removed or otherwise utilized, and the Seller shall have the right at all reasonable times, through such agents or attorneys as may be thereunto appointed, to examine such books and records....

9. Purchaser agrees that, in addition to all amounts payable by the Purchaser to the Seller under the provisions of Paragraphs 2A, 2B and 4A or 4C hereof, Purchaser, during the entire term of this agreement, shall also pay (a) all costs, charges and expenses of the Purchaser's operation and management of said land and the timber thereon, including, but not limited to, fire protection, and (b) all severance or similar taxes levied or assessed upon, with respect to or measured by the timber purchased, cut, removed or otherwise utilized under the provisions of this agreement, and (c) as an additional part of the purchase price of the timber, commencing with January 1, 1957 all ad valorem taxes and other taxes assessed against the lands or the timber thereon or the improvements, structures and equipment now on said lands subject to this agreement or hereafter placed thereon by the Purchaser; and the Purchaser shall promptly pay such amount to Seller or to the proper tax-collecting authority, as agent for Seller.... In event taxes shall be assessed or levied against or in connection with the ownership of oil, gas or minerals, or, rights pertaining thereto, separate from any other taxes assessed or levied against or in connection with the ownership of the land or other interests therein, then the Seller shall pay the same notwithstanding the prior provisions of this paragraph. Seller shall promptly transmit to the Purchaser all tax statements and notices received by Seller relating to taxes payable by Purchaser hereunder.

10. A. Purchaser shall have, and is hereby granted a license and the right to use, occupy and repair all existing improvements, buildings, facilities, fences and structures owned by the Seller now upon said land described in Exhibit "A". Purchaser shall at all times during the term of this agreement, (unless relieved of such obligations by an instrument in writing executed by the Seller) maintain in good condition and repair (and when necessary replace upon said lands) any exterior fencing now on the lands and shall at the expiration or termination of this agreement return

said fences (unless excused by the Seller from so doing) to Seller in as good condition as when received, ordinary wear and tear excepted. The Purchaser may remove, demolish, dispose of or sell any buildings, structures and improvements (other than exterior fencing) that Purchaser is authorized to occupy and use. . . .

11. The Purchaser shall have, and is hereby granted a license to construct and thereafter to use, maintain, and occupy such buildings, improvements and facilities, including without limitation structures, mills, tracks, equipment, machinery, roads, bridges, ditches, canals, fences, and other improvements upon said land which in its opinion shall be necessary or convenient in carrying out its operations thereon and may at any time prior thereto or within six (6) months (or one year if terminated under Paragraph 1B) after the expiration or termination of this agreement remove the same (except such as are replacements of existing fences) whether or not so fixed to the land as to be regarded in law as a part of the land, if Purchaser is not then in default hereunder. Except as such rights are restricted or limited by other provisions of this agreement, Purchaser shall have during the term of this agreement, to the exclusion of all others, a license for all surface rights upon said lands needed from time to time by Purchaser in the development of the forest lands as herein contemplated, including free and unlimited logging privileges, elimination of hardwoods which are considered by Purchaser not to be suitable for production of pulp and which are not so utilized or sold by Purchaser, the removal and sale of stumps, grazing rights for cattle, game, fish and wildlife management (subject to the provisions of Hunting Letter Agreement of even date herewith), the right of ingress and egress for Purchaser's agents, employees, invitees, licensees and timber contractors, and the right to build and operate railroads upon and over said lands for the purpose of removing timber and timber products therefrom and for the purpose of transporting timber, timber products, supplies, equipment and employees over or across said lands; provided, however, no grazing

rights shall be granted to a third party, if Seller within thirty days after Purchaser has given Seller notice of intention so to do, objects thereto and gives Purchaser notice in writing thereof.

12. The Seller hereby reserves all oil, gas and other mineral rights on, in and under the surface of said land, together with the right to enter upon said lands and explore for, mine, drill, produce, remove and sell the same, and the exclusive right to make leases, or other agreements in connection with, or with respect to the exercise of, the above reserved rights; subject, however, to the covenants, conditions and limitations hereinafter set forth:

A. No strip or surface mining which shall materially interfere with the growing or production of timber will be conducted on the land.

B. Seller covenants to pay to Purchaser the amount of any loss or damage to, or destruction of property of the Purchaser, or to the timber producing capacity of the land, or the timber upon said land (for which damage Purchaser is not otherwise compensated), resulting from such exploration for or mining, drilling or producing of, any oil, gas or minerals or operations incident thereto, or from fire due to any of said activities on said lands.

. . . .

13. A. Seller hereby warrants to the Purchaser that the Seller as of the date hereof is the owner of a fee simple unencumbered marketable title to the land described in Exhibit "A", subject only to the exceptions set forth in this Paragraph 13A, and Seller will and by these presents does covenant and agree to forever defend the same; that Seller has a good right to sell and convey to Purchaser the timber and timber rights hereby agreed to be sold or granted to the Purchaser; that the area of the lands described in Exhibit "A" is fifty seven thousand, three hundred and ninety-four (57,394) acres, more or less, that Seller will secure and maintain the Purchaser, its successors and assigns, in full, complete and exclusive possession of the land described in Exhibit "A" and the timber

thereon to the extent, in the manner and for the purposes as set forth in this agreement....

....

(2) All right, title and interest of the Seller, in and to the leases, agreements and instruments described in above subparagraphs (f) to (k) inclusive, and (m) and (n),[18] and all rights, privileges and options of the Seller thereunder are hereby assigned, set over and transferred to Purchaser, and the said Purchaser in its name or in the name of the Seller may exercise all of such rights, privileges and options granted to Seller by such leases, agreements and instruments.

....

15. The title to timber shall pass from Seller to Purchaser when and only when such timber is severed from the land.

....

22. A. This agreement and the rights and obligations of the parties hereunder shall be construed according to the laws of the State of Alabama.

## OPINION ON RECONSIDERATION

Pending before the court is defendant's motion for reconsideration of the opinion issued in this case on March 21, 1988. See *supra* at 668. For good cause shown, on April 5, 1988 the court reopened the opinion for reconsideration; plaintiff's response to the Government's motion was allowed to be filed on this same date. For the reasons expressed herein, the court vacates in part its March 21, 1988 opinion but, because the result does not change, denies the motion for reconsideration.

The relevant facts are fully discussed in the March 21st opinion, at 669–72, and will not be repeated here. The court concluded "that Tensaw had sufficient 'accou-

terments of ownership' under the specific terms of the extension agreement such that its holding period in the timber that was sold to St. Regis on July 1, 1978 exceeded one year." At 675. This conclusion was based on the presumption that the extension agreement constituted either a modification of the 1956 Agreements or a completely new agreement and was, therefore, the only agreement in force after November 1976. This presumption is incorrect.

The court was under the impression that no matter how the 1956 Agreements were characterized—as leases that became void on November 26, 1976 pursuant to Ala. Code § 35–4–6, or as licenses that would continue in force after this date—the extension agreement gave each party the unilateral power to terminate the entire contractual relationship upon notice to the other party. Accordingly, the court held that this power to terminate, in association with the other provisions contained in the extension agreement (i.e., the provisions of the 1956 Agreements), gave Tensaw sufficient burdens and benefits of ownership to justify the conclusion that it held the timber until July 1, 1978. At 672. After a further analysis of the record, however, it becomes apparent that, at least from St. Regis' viewpoint, the parties' contractual relationship would not come to an end if one of them decided to terminate the extension agreement. Because St. Regis never agreed that the 1956 Agreements constituted leases that became void on November 26, 1976, it would argue that the 1956 Agreements would still govern the parties' relationship.[1] St. Regis thus never agreed to a contract modification that superseded the 1956 Agreements. Consequently, the court's conclusion that "the 1976 continuation agreement between the parties independently provided Tensaw with the requisite holding period in the timber," At 672 n. 10, is correct only if the 1956

---

**18.** These subparagraphs list various agreements entered into by Tensaw before the execution of the 1956 Agreements, including hunting and trapping leases, a stumpwood sales contract, a grazing and pasture lease, and several other leases.

**1.** The court expressly declined to rule on whether Tensaw held the timber under the 1956 Agreements. At 675 n. 17.

Agreements constituted leases that became void on November 26, 1976 pursuant to Ala.Code § 35–4–6. Only in this circumstance could the parties' contractual relationship be completely terminated by either Tensaw or St. Regis.

■ As explained below, the court finds that Tensaw "held" the timber from November 26, 1976 until July 1, 1978, or for approximately nineteen months. This conclusion is based on the following three-step analysis: (1) The 1956 Agreements constitute leases of the timberlands and surface rights to St. Regis as opposed to licenses to cut timber; (2) under Ala.Code § 35–4–6, the lease became void as between the parties on November 26, 1976, thus resulting in a reacquisition by Tensaw of the property interests granted to St. Regis in 1956; and (3) under the terms of the 1976 extension agreement between Tensaw and St. Regis, Tensaw possessed sufficient incidents, or burdens and benefits, of ownership to justify the conclusion that it held the timber until July 1, 1978, when a new long-term agreement was reached by the parties.[2] Accordingly, defendant's motion for reconsideration must be denied.

A. *Characterization of the 1956 Agreements*

Alabama Code § 35–4–6 provides that leases "for more than 20 years shall be void for the excess over said period unless ... recorded within one year after execution in the office of the judge of probate in the county in which the property leased is located." Accordingly, Tensaw argues that the 1956 Agreements, which were never recorded, constitute sixty-year leases that became void on November 26, 1976 (twenty years after the agreement between Tensaw and St. Regis was executed) and that the timber leased to St. Regis "reverted" to Tensaw on this date, thus beginning Tensaw's holding period in the timber.[3] Defendant argues that the 1956 Agree-

ments constitute licenses and that section 35–4–6 is therefore inapplicable; thus, the timber never "reverted" to Tensaw. To determine the applicability of section 35–4–6 the court must first classify the 1956 Agreements as either leases or licenses.

Generally speaking, "State law determines what property rights and interests a taxpayer has, but federal law determines the consequences of such rights and interests for tax purposes." *Cotnam v. Commissioner*, 263 F.2d 119, 121 (5th Cir.1959); *see also Case v. United States*, 633 F.2d 1240 (6th Cir.1980). Moreover, "in determining the nature of property rights created by a conveyance ..., both this court and other federal courts have applied the law of the situs of the real property involved." *Foster v. United States*, 221 Ct.Cl. 412, 420–21, 607 F.2d 943, 948 (1979). Accordingly, the court first looks to Alabama law, as stated by the highest court of the state, to determine whether the 1956 Agreements constitute leases or licenses. *See United States v. Bowery Sav. Bank*, 185 F.Supp. 30, 33 (S.D.N.Y.1960), *aff'd*, 297 F.2d 380 (2d Cir.1961); *see also* 1956 Agreements ¶ 22A, *reprinted as an* Appendix at 675, 680.

In *Holt v. City of Montgomery*, 212 Ala. 235, 102 So. 49, 50–51 (1924), the Supreme Court of Alabama stated:

The distinction between a lease and a license appears to be very well stated in a quotation found in *Stinson v. Hardy*, 27 Or. 584, 41 P. 116, as follows:

"A lease is a contract for the possession and profit of land by the lessee, and a recompense of rent or increase to the lessor, and is a grant of an estate in the land. * * * A license is an authority to do some act or series of acts on the land of another, for the benefit of the licensee, without passing any estate in the land...."

....

---

**2.** Discussion of this last step is omitted. It is adequately set forth in the March 21, 1988 opinion. *See* p. 668.

**3.** Tensaw also argues that its holding period in the timber was continuous throughout the term

of the 1956 Agreements. Because the court finds that Tensaw held the timber after November 26, 1976 under the extension agreement, the court need not rule on this argument. *See* March 21 opinion at 675 n. 17.

One of the principal tests in determining whether or not the contract is to be interpreted as a lease or a license is whether or not it gives exclusive possession of the premises against all the world, including the owner, in which case a lease is intended, or whether it merely confers a privilege to occupy under the owner, thereby indicating a license.

The Court of Claims has generally agreed with the explanation of the lease/license distinction described in *Holt.* *See, e.g., Georgia–Pacific Corp. v. United States,* No. 315–75 (Ct.Cl. Nov. 6, 1980) (trial judge decision); *Assateague Beach Corp. v. United States,* 538 F.2d 346, 209 Ct.Cl. 713, 713 (1976) (holding that "absolute or generalized dominion and control" distinguishes a lease from a license) (citing the decision of Trial Judge Schwartz, 21 CCF ¶ 84,502, at 89,849 (1975)).

■ The significant question thus faced by the court in characterizing the 1956 Agreements is whether St. Regis was granted "exclusive possession" of the timberlands and the timber contained thereon. Although the Alabama Supreme Court has not specifically defined "exclusive possession," several cases clarify this term. In *Mason v. Carroll,* 289 Ala. 610, 269 So.2d 879 (1972), the supreme court held that an agreement in which the defendant had the "exclusive right, privilege and license of constructing and operating" a 3 par golf course constituted a leasehold interest. *Id.* at 880–81. The court did not construe "exclusive possession" to require absolute dominion over the land for all possible purposes. Limited rights or interests in land can constitute leases under Alabama law. *See Reeves v. Alabama Land Locators, Inc.,* 514 So.2d 917, 919 (Ala.1987) ("It has been held in Alabama that a lease of timber rights is a conveyance of real property within the meaning of" Alabama's recording statute.); *Burton v. Steverson,* 206 Ala. 508, 91 So. 74, 76 (1921) (characterizing an instrument that granted the right to extract turpentine from standing timber as a lease); *Milliken v. Faulk,* 111 Ala. 658, 20 So. 594, 595 (1896) ("A lease is a contract or agreement for the possession and profits of lands and tenements.") (charac-

terizing "an interest in and use of the trees for three years" as a lease). Similarly, in *Ramos v. Fell,* 272 Ala. 53, 128 So.2d 481 (1961), the court concluded that an agreement to rent a designated area on a dock for three days so that plaintiff could moor his boat constituted a lease. The court stated, "[Plaintiff] had the right to exclusive possession of the area so designated against all the world, including the owner or operator of the dock. [Plaintiff] was a lessee, not a licensee." *Id.,* 128 So.2d at 484.

Other state courts have also recognized that the possession of land for a limited purpose could constitute a leasehold interest. In *Sproul v. Gilbert,* 226 Or. 392, 359 P.2d 543 (1961), for example, the Oregon Supreme Court discussed at length the meaning of "exclusive possession":

To create a leasehold interest the lessee must be granted the right of possession. A license is a revocable privilege to use land in the possession of another. Restatement of Property, Servitudes, § 514. It is commonly said that the lessee must have "exclusive possession," ... but this is not strictly true because all possessory interests, including even a fee simple, are subject to limitations making the possessory right something less than exclusive. Translating "exclusive possession" to mean the right to exclude others, it is apparent that as against the lessor the exclusiveness of possession may vary depending upon the restrictions imposed upon the transferee's use by the creating instrument.... Even in the absence of express reservations in the creating instrument, the lessee's right to exclude others is less than complete for the landlord always has the right to enter to demand rent and to make repairs.... [I]t is common in the creation of a leasehold interest to limit the lessee's use of the property to certain specified activities. In the sense that he does not have the privilege to use the property for proscribed activities, the lessee's possession is not exclusive....

....

A part of the variability in the meaning of possession arises out of the fact that possession has meaning only in terms of actual or potential use and because the uses to which land may be put vary from parcel to parcel. When the property is amenable to many uses, the right to use it for a single limited purpose might not constitute possession; yet, the same right to use may well be regarded as possessory if the land in question is susceptible to only a limited number of uses. And so, in the present case, since the land in question is of little use for anything other than grazing, mining and recreation, the grant of the right to use it for grazing purposes embraces a substantial part of all of the practical uses to which the land may be put. Therefore, although such use is limited, it is relatively "exclusive."

*Id.* at 549–50 (citations omitted).

The 1956 Agreements contain several provisions that indicate "exclusive possession" of the timberlands was conveyed to St. Regis. Under paragraph 1 of the agreements, St. Regis purchased "all timber growing and to be grown" on the land. Although the contract contains various limitations upon the amount of timber that could be cut each year, St. Regis clearly had the exclusive right to cut and remove timber on the land.[4] This right was significant in that the surface of the timberlands subject to the 1956 Agreements was capable of supporting only timber farming and hunting.[5] *See Sproul,* 359 P.2d at 549–50. In addition, paragraph 5A of the 1956 Agreements at 678 required St. Regis to "manage and operate said lands and the timber thereon in accordance with good forest practices ... in such manner that the average annual growth or reproduction shall not be less than the amount of timber cut and removed or otherwise utilized annually." St. Regis alone was thus responsible for managing and operating the timberlands.

Finally, paragraphs 10A and 11 of the 1956 Agreements granted St. Regis the right to use all existing buildings, facilities, and other improvements on the land and to construct any additional such improvements if necessary or helpful to its timber operations. *See* appendix at 678–79. These two paragraphs, in association with the contract provisions described above and the language in paragraph 13A of the 1956 Agreements,[6] demonstrate that St. Regis had exclusive possession of the timberlands for a limited purpose—timber farming. As stated previously, Alabama courts have not construed "exclusive possession" to require absolute dominion over the land for all possible purposes.

In *Steward v. St. Regis Paper Co.,* 484 F.Supp. 992 (S.D.Ala.1979), a diversity of citizenship case applying Alabama law, the court held that an agreement practically identical[7] to the 1956

---

4. Although Tensaw reserved "all oil, gas and other mineral rights on, in and under the surface" of the timberlands, 1956 Agreements ¶ 12, at 679, and could arguably remove trees while exploring for these resources, it had to reimburse St. Regis for any loss or damage to such trees. Tensaw could not otherwise cut or remove trees from the lands.

   Under paragraph 5 of the 1956 Agreements, at 678, Tensaw retained "access to the land for any and all purposes not inconsistent with the terms and provisions of this agreement, including inspections, surveys and cruises." Allowing Tensaw access to the land to cut and remove timber would clearly be inconsistent with the agreement.

5. The right to hunt on the timberlands was not reserved by Tensaw in the 1956 Agreements. Pursuant to a Hunting Letter Agreement exe-

cuted on the same day as the 1956 Agreements, however, St. Regis granted all hunting rights to certain officers/shareholders of Tensaw and their families. *See* March 21 opinion at 670.

6. "Seller will secure and maintain the Purchaser, its successors and assigns, in full, complete and exclusive possession of the land ... and the timber thereon to the extent, in the manner and for the purposes as set forth in this agreement...." *See* appendix at 679.

7. The primary difference was that, under the agreement at issue in *Steward,* St. Regis would receive "fifty percent of all sums received by the [landowners] for oil, gas or minerals." 484 F.Supp. at 998. The 1956 Agreements did not provide for the sharing of oil, gas, or mineral profits. This difference does not in itself, however, distinguish *Steward* from the case at bar.

Agreements was a license rather than a lease:

> Having examined these and other provisions of the Timber Purchase Agreement and the Timber Cutting Agreement, the court concludes that *the parties did not intend to exclude the grantor from the land.* The primary test of *Holt* and *Mason,* therefore, indicates that the agreement is a license rather than a lease.

484 F.Supp. at 998 (emphasis added). The court's focus here and in other parts of its opinion on the parties' intent to exclude the grantor from the land [8] evidences an overly-restrictive interpretation of "exclusive possession." The court's interpretation indicates that only complete physical exclusion of the grantor under the agreement would constitute "exclusive possession." As stated above, however, absolute dominion and control over the land for all purposes is not required. An intent to exclude the grantor from dominion and control over the land for a single purpose—e.g., timber farming, hunting, turpentine extraction—can be sufficient. *Cf. Reeves,* 514 So.2d at 917, 919 (holding that a lease agreement which granted the exclusive right to hunt on the property, i.e., a hunting lease, was a "conveyance of real property" within the meaning of Alabama's recording statute). Consequently, this court must respectfully disagree with the district court's conclusions.[9]

■ Based on the various provisions contained in the 1956 Agreements, the court concludes that Tensaw *leased* to St. Regis the surface rights and improvements on the subject land for St. Regis as lessee to conduct timber cutting operations thereon. *See Superior Pine Prods. Co. v. United States,* 201 Ct.Cl. 455, 480 (holding, without reliance on state law, that an agreement substantially similar to the 1956 Agreements constituted a lease), *cert. denied,* 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973); *see also Superior Pine Prods. Co. v. Williams,* 214 Ga. 485, 106 S.E.2d 6, 11 (1958).

## B. *Applicability of Ala. Code § 35-4-6*

■ Alabama Code section 35-4-6 provides:

> No leasehold estate can be created for a longer term than 99 years. Leases for more than 20 years shall be void for the excess over said period unless acknowledged or approved as required by law in conveyances of real estate and recorded within one year after execution in the office of the judge of probate in the county in which the property leased is situated.

Because the 1956 Agreements were never recorded in the Office of the Probate Judge for any of the counties in which the subject timberland was located, and because the court concluded above that the agreements constitute leases, section 35-4-6 arguably applies to void the agreements on November 26, 1976 (twenty years after their date of execution).

Defendant contends, however, that section 35-4-6 does not apply to void a lease as between the parties to the lease. It points to *Eastwood Mall Associates, Ltd. v. All American Bowling Corp.,* 518 So.2d 44 (Ala.1987), where the Alabama Supreme Court stated:

> The plain purpose of § 35-4-6 is to provide notice to innocent purchasers of property who otherwise might purchase property and then discover an unrecord-

---

**8.** *See, e.g.,* 484 F.Supp. at 996 ("Paragraph 5 discloses no intent to exclude the grantor from the land."); *id.* at 997 ("Paragraph 12 is a clear indication that St. Regis does not have the right to possession of the land 'to the exclusion of' the plaintiffs."); *id.* at 998 (stating that the intent to exclude the grantor is the most important test in determining the nature of the interest conveyed).

**9.** This court is not bound by the district court's decision. *See Forward v. Cotton Petroleum*

*Corp.,* 540 F.Supp. 122, 124 n. 4 (D.Colo.1982). "In a diversity of citizenship case the federal district court sits as a state trial court and applies the law of the forum state." *Brady v. Hopper,* 751 F.2d 329, 332 (10th Cir.1984) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Consequently, such cases have no precedential value as state law. *See Peterson v. U Haul Co.,* 409 F.2d 1174, 1177 (8th Cir.), *modified,* 421 F.2d 837 (8th Cir.1969).

ed lease on the property that deprives them of the benefits of ownership for up to 99 years. See *Harco Drug, Inc. v. Notsla, Inc.*, 382 So.2d 1 (Ala.1980). In the instant case, Eastwood and Wilson [the landlords] had actual notice of the lease and its terms; thus, the purpose of § 35–4–6 was satisfied and they should not be permitted to use this statute to the detriment of All American [the tenant].

*Id.* at 46. Reliance upon this statement alone would support defendant's argument that section 35–4–6 does not apply as between the parties to a lease. An examination of the context of the court's statement, however, including several other Alabama Supreme Court cases construing section 35–4–6, reveals that the statute does apply in the circumstances of the present action.

In *Eastwood Mall*, J.R. Waters leased a certain area in a shopping mall to All American Bowling Corporation ("All American"). "The lease was for a term of twenty years, beginning on September 1, 1960, and ending on August 31, 1980. All American was given an option to extend the original term of the lease for two further terms of 10 years each." 518 So.2d at 45. Before the original lease term expired, Alabama Farm Bureau Mutual Casualty Insurance Company ("Farm Bureau") acquired the Eastwood Mall property and thus became the new landlord. In December 1979, Farm Bureau and All American executed an agreement to extend the lease for a term of ten years, ending on August 31, 1990. In August 1984, Farm Bureau sold the property, and assigned all of the mall leases, to Eastwood Mall Associates, Ltd. ("Eastwood").[10] After the purchase of the property, Eastwood and Wilson continued to accept rental payments from All American until June 1986, a period of about two years. In June 1986, Eastwood and Wilson informed All American that the lease had become void as of September 1, 1980 by operation of Ala.Code § 35–4–6 because it had not been recorded within one year of its execution.

In deciding whether section 35–4–6 applied to the lease between Eastwood and All American, the Alabama Supreme Court first concluded that the original lease was actually for a term of forty years because the two ten-year options had to be added to the initial lease term. The court stated, "Accordingly, the excess of the term over 20 years is void." 518 So.2d at 46. After discussing the trial court's findings in the case,[11] the court held:

In the instant case, Eastwood and Wilson accepted the rental payments for approximately two years, and it appears from the record that All American fully performed its obligations under the lease. Accordingly, *we hold that estoppel applies in this case.*

Based upon the determination that Farm Bureau and All American entered into a new lease agreement, coupled with Eastwood and Wilson's acceptance of rental payments under the lease, the judgment of the trial court is affirmed.

518 So.2d at 46 (emphasis added).

Thus, the court's holding is premised only upon estoppel and the fact that the parties entered into a new lease agreement. The original forty-year lease between Farm Bureau and All American was void after twenty years under section 35–4–6.[12] *Id.* Because a lease for more than twenty years did not exist between Eastwood and All American—the lease assigned to Eastwood in 1984 was the new agreement that was executed by Farm Bureau and All

---

**10.** Eastwood was an Alabama limited partnership. James W. Wilson, Jr. was a general partner.

**11.** The trial court found that the parties (Farm Bureau and All American) entered into a new lease agreement following the end of the initial 20–year term, thus precluding an application of section 35–4–6, and that Eastwood and Wilson should be estopped from asserting that the lease became void in 1980 because they accepted rental payments for approximately two years.

**12.** The court was thus applying section 35–4–6 to the original parties to the lease. If a lease for more than 20 years existed between Eastwood and All American, presumably the court would have voided—on the same ground—the excess of the term over 20 years.

**686**

American in December 1979 [13]—the court could not apply section 35–4–6 to void their relationship. Accordingly, the court's statement regarding the purpose of section 35–4–6 is dicta to the extent it supports defendant's position.[14] "Dicta alone, while entitled to consideration, is not of itself an authoritative expression of the law of the state." *Estate of Goldstein v. Commissioner*, 479 F.2d 813, 816 (10th Cir.1973). More importantly, however, the court's statement, when read in context, does not preclude an application of section 35–4–6 as between the parties to a lease. In light of other pronouncements by the Alabama Supreme Court regarding section 35–4–6, *see, e.g., Reeves v. Alabama Land Locators, Inc.,* 514 So.2d 917, 919 (Ala.1987) ("Section 35–4–6 deals with the validity of a lease as between the parties to the lease."); *Byrd Cos. v. Birmingham Trust Nat'l Bank,* 482 So.2d 247, 252–55 (Ala.1985) (applying section 35–4–6 as between the parties to the lease); *Penrod v. Lapere,* 367 So.2d 1381, 1384 (Ala.1979) (same),[15] and the fact that the statute does not, on its face, limit its application to any particular parties,[16] the court concludes that the statute does apply as between the parties to a lease.[17] Consequently, under section 35–4–6, the 1956 Agreements became void on November 26, 1976. The only agreement in force between Tensaw and St. Regis after this date was the extension agreement. If one of the parties decided to terminate the extension agreement upon notice to the other party, the entire contractual relationship would have come to an end.

Given the court's analysis in its March 21, 1988 opinion regarding Tensaw's burdens and benefits of ownership assuming that only the extension agreement was in force, Tensaw held the timber between November 26, 1976 and July 1, 1978.

*Conclusion*

For the reasons expressed above and in the March 21, 1988 opinion, the court concludes that Tensaw had sufficient "accouterments of ownership" under the specific terms of the extension agreement such that its holding period in the timber that was sold to St. Regis on July 1, 1978 exceeded one year. *See* March 21 opinion at 675 & n. 17. Defendant's motion for reconsideration is therefore denied. The March 21, 1988 opinion is vacated and modified to the extent it is inconsistent with this opinion on reconsideration. On or before May 16, 1988, the parties shall jointly submit to the court a proposed date for the pretrial conference or, if no trial is necessary, a joint status report indicating the parties' positions on settlement.

It is so ORDERED.

**13.** This new lease agreement was for a term of 10 years, with an option for an additional 10 years.

**14.** "A dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Sarnoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986).

**15.** In addition, the case cited by the court in *Eastwood Mall* to support its statement on the purpose of section 35–4–6, *Harco Drug, Inc. v. Notsla, Inc.,* 382 So.2d 1 (Ala.1980), implicitly recognizes that the statute does apply as between a lessor and lessee.

**16.** "To justify a departure from the language of the statute, there must be a moral conviction that its practical effect under existing law, the spirit of the whole statute and its legislative history, as well as the purpose to be accomplished, duly disclose the Legislature could not have intended such result under a rational, sensible construction.... When the language is plain, it should be considered to mean exactly what it says." *Alabama Indus. Bank v. State ex rel. Avinger,* 286 Ala. 59, 237 So.2d 108, 111 (1970).

**17.** If the *Eastwood Mall* court intended to significantly change its long-standing interpretation of section 35–4–6, it did not reveal this intention.