382 So.2d 1 (1980)
HARCO DRUG, INC.
v.
NOTSLA, INC., et al.
NOTSLA, INC., a corporation
v.
HARCO DRUG, INC., et al.
78-334, 78-334X.
Supreme Court of Alabama.
March 14, 1980.
*2 George S. Wright, of Rosen, Wright, Harwood & Albright, Tuscaloosa, for appellant/cross-appellee Harco Drug, Inc.
Darryl Hardin, of Hardin & Gordon, Tuscaloosa, for cross-appellant Notsla, Inc.
Perry Hubbard, of Hubbard, Waldrop, Tanner & deGraffenried, Tuscaloosa, for appellee Sam Jackson.
JONES, Justice.
The Tuscaloosa Housing Authority filed application to condemn property owned by Notsla, Inc., and occupied by two leaseholders, Harco Drug, Inc., and Sam Jackson, a sole proprietor. Following a jury trial, the damages were assessed at $240,000. After deducting attorney's fee of $17,500, the Circuit Court allocated the remaining $222,500 as follows:

 Notsla, Inc. (Owner) $197,000
 Harco Drug (Lessee) 19,500
 Sam Jackson (Lessee) 6,000
 _________
 $222,500

Notsla, the property owner, appeals the award of $6,000 to Sam Jackson, contending Sam Jackson did not have a leasehold interest. Harco Drug, a leaseholder, appeals its award of $19,500, claiming it is insufficient.
The lease in question between Sam Jackson and Notsla states in relevant part:

*3 "It is further hereby agreed that if the Lessee shall continue on said premises, or any part thereof, after termination of this contract, then this contract shall continue under full force under all the terms and conditions and covenants hereinafter set out."
The original term of the lease ran for five years from 1950 to 1955. At the end of the original term, Jackson held over and the term was automatically extended for another five-year period. Jackson continued to hold over for successive five-year terms until 1977 when the housing authority took over the property. Because the lease was one for five years with a right to hold over for five consecutive five-year periods, Notsla contends it should be deemed a lease for thirty years. Therefore, says Notsla, after 1970 (twenty years after the beginning of the lease), Jackson was only a tenant at will on a month-to-month basis without a compensable leasehold interest inasmuch as there was no evidence that Jackson had complied with the requirement of recording leases beyond 20 years as provided by § 35-4-6, Ala.Code 1975:
"Leases for more than 20 years shall be void for the excess over said period unless acknowledged or approved as required by law in conveyances of real estate and recorded within one year after execution in the office of the judge of probate in the county in which the property leased is situated."
The policy expressed by the statute is that a person should not be permitted to tie up his property by a lease for a period greater than twenty years. Tennessee Coal, I. & R. R. v. Pratt Consol. Coal Co., 156 Ala. 446, 47 So. 337 (1908). Tennessee Coal, which is cited by Notsla in support of its argument, concerned a 20-year lease under which the tenant had an absolute and unconditional right to hold over for an additional period of twenty years. As such, the lease was one for 40 years and violated the twenty-year statute. Tennessee Coal, supra, at 448, 47 So. 337. That is not the case here. Jackson, the tenant, received no absolute right to hold over for a period in excess of twenty years. The holdover provision in the lease here gave no right to the lessee, but it existed for the benefit of the lessor, who could have terminated the lease on any fifth anniversary. As such, the term of the lease did not exceed twenty years so as to require recordation. With respect to this issue, the judgment of the court below allocating $6,000 to Sam Jackson is affirmed.[1]
The second and more difficult issue raised on this appeal concerns the allocation of the condemnation award as between Notsla, the property owner, and Harco Drugs, a lessee. Harco claims error in the Trial Court's allocationNotsla, Inc., $197,000; Harco Drug, $19,500.
In all cases where property taken for public use is in multiple ownership, each of the owners of an interest in the property has a corresponding right to share in the award. The award is thus apportioned in accordance with the respective interests of such owners. 4 Nichols, The Law of Eminent Domain, § 12.42. Where the multiple estate consists of a lessor and a lessee, compensation is due the lessor for damage to his reversionary interest, and to the lessee for damage to his leasehold. 4 Nichols, The Law of Eminent Domain, § 12.42(1).
Generally, the measure of compensation for an entire leasehold interest taken under eminent domain is said to be the difference between the fair rental value of the leased premises for the unexpired term of the lease and the rent reserved in the lease. United States v. Petty Motor Co., 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1945); Shell Oil Co. v. Guyton, 364 So.2d 292 (Ala.1978); Gamble v. State, 289 Ala. 131, 266 So.2d 286 (1972); City of Dothan v. Wilkes, 269 Ala. 444, 114 So.2d 237 (1959); 4 Nichols, The Law of Eminent Domain, § 12.42(3).
*4 Four witnesses, including Harco's president, testified to the value of the disputed leasehold in this case. Apart from Harco's president, who testified to a valuation of $125,970.35, there were three other witnesses, qualifying as experts (two testifying for Harco and one for Notsla), who assigned valuations of $55,220.30, $72,204.52, and $153.00. According, then, to the property owner's witness, the lessee's compensable leasehold interest was worth only slightly more than his obligation to pay rent, despite the fact the lessee had added fixtures and made major improvements. On the other hand, the highest valuation testified to by lessee's witnesses amounted to more than half the sum of the total award, although the lessee Harco had only occupied one third of the whole premises under a lease having less than eight years more to run.
Notsla's witness used a capitalization method for evaluating Harco's leasehold interest. According to this method, the accepted annual rate of return for investment is multiplied by the total value of the investment realty. This amount is then multiplied by the unexpired term of the lease to give the leasehold value as of the time of the taking. Notsla's expert witness testified that the rate of return for investment ought to be 10%. He then multiplied this by $240,000 (the total condemnation award) to give an expected annual return of $24,000. This amount was reduced to one-third, representing the approximate portion of the total property occupied by Harco. According to this calculation, then, Harco's leasehold was worth $8,000 per year, or but $20 more than the actual contract rent per year of $7,980.
The fallacy here is in the assumption that the one-third area occupied by Harco was proportionately equivalent to the other two-thirds. The evidence in this case, to the contrary, is that Harco had spent a great deal on fixtures, improvements, and repairs, and that at least one-third of the remainder of the property was in a state of disrepair and, in fact, unoccupied.
The testimony of Harco's experts in this case is also unsatisfactory as evidence of Harco's compensable leasehold interest. Harco's witnesses all used a formula whereby the leasehold value is determined by calculating the difference between the contract rent (the rent in fact) and the economic rent (fair market rental value) at the time of the taking, and then multiplying this amount by the unexpired term of the lease, which sum is then discounted by a factor representing the difference in value between present and future money. Using this formula, Harco's witnesses determined the compensable leasehold value to be alternatively $55,220.30, $72,204.52, or $125,970.35. The disparity among the various witnesses is the result of the differing economic rents assigned by them to Harco's lease.
All three of Harco's witnesses based their estimates of the economic rent on a percentage of store sales. The first expert testified that the reasonable rental value for drug stores in the area was 3% of sales. The second expert testified that the average rental of Harco's eight stores statewide was 2.6% of sales, and Harco's president stated that, had he renegotiated his lease at the time of the taking, he would have been willing to pay a rental as high as 3.6% of sales due to the relatively high profit margin at the Tuscaloosa store. According to this testimony, the monthly economic rent of Harco's lease was calculated as being, alternatively, $804.39, $1,464, or $2,500. The actual monthly contract rent was $665.
Presumably, this testimony, relating the value of Harco's lease to its operation of a successful drug store, was admitted on the basis that it constituted valuation of the leasehold according to its "highest and best use." While loss of business profits is not as such compensable in eminent domain proceedings, according to the general rule, income derived from a business on the condemned property is a factor which may be considered in arriving at the fair market value of the property. 27 Am.Jur.2d, Eminent Domain, § 285 at 83-86. It is not clear, however, whether this is a *5 distinction in fact or, rather, a device employing the ruse of "highest and best use" for avoiding the inequitable results of the general rule against compensation for business losses.[2] Be that as it may, our disapproval of Harco's evidence is due not so much to the general rule against compensation for business losses, which in any case is founded upon a dubious rationale,[3] but to the fact that, under the existing undivided fee rule, similar considerations pertaining to the property's "highest and best use" could not have gone into computing the total award to the property owner, Notsla. Therefore, an award to the lessee on the basis of the leasehold's "highest and best use" would amount to the owner's paying the lessee a sum which was not included in the total award made by the condemnor and which the owner in fact did not receive.
The "undivided fee rule" is stated in City of Dothan v. Wilkes, 269 Ala. 444, 114 So.2d 237 (1959), as follows:
"[W]here there are several interests or estates in a tract of land taken by eminent domain, the proper method of fixing the value of or damage to each interest or estate is to determine the value of or damage to the interests as a whole and then to apportion the gross award among the several owners according to their respective interests." 269 Ala. at 447, 114 So.2d at 240.
The rule is elaborated upon in 4 Nichols, The Law of Eminent Domain, 3d Ed., § 12.36(1), at 685ff., as follows:
"It was formerly looked upon as one of the most firmly established principles of law of eminent domain, and it is still the law in the usual case, that when a tract of land is taken by eminent domain, as the land itself is taken by a paramount title rather than the separate estates of different persons having interests in the land, the compensation awarded is for the land itself, and not for the sum of the different interests therein. The duty of the public to make payment for the property which it has taken is not, it is said, affected by the nature of the title or by the diversity of interests in the property. The public pays what the land is worth, and lets the amount so paid be divided among the various claimants, according to the nature of their respective estates."
It is taken for granted that the sum of the values of the divided interest will be exactly equal to the value of the fee as embodied in the total award. In reality, however, the result of a valuation of the undivided estate is often that the total compensation is materially less than an amount sufficient to indemnify the separate claimants, leading one authority to analogize that "[i]n that case, the court finds itself in the place of the head of the household who must superintend the carving up and distribution *6 of a chicken which is really not big enough to go around . . .." Orgel, On Valuation Under Eminent Domain, at 482.
It is interesting to observe, further, that had the owner in this case himself operated a business on his property, business profits and sales would have, presumably, been a factor in determining the property's fair market value without violating either the rule against compensation for business losses or the undivided fee rule. Here, though, equitable considerations preclude us from allowing Harco the full recovery to which it might otherwise be entitled under the doctrine of "highest and best use" were it not for the "undivided fee rule" which prevented the total award from adequately representing the respective interests of both the lessee and the lessor. Apart from the rule itself, the inadequacy of the total award is demonstrated by the relatively high valuation placed on the leasehold by Harco's witnesses in proportion to the total award though Harco, in fact, occupied only a third of the whole premises under a short term lease having less than eight more years to run. The parties do not appeal the amount of the total award; and, accordingly, this is the amount from which the parties' respective interests must be apportioned.
Nevertheless, the lessee, Harco, is entitled to share in the total award only in proportion to its respective interest. The total award stands in place of the land, and the owners of each interest may recover out of the award the same proportionate interest which they had in the land condemned. 4 Nichols, The Law of Eminent Domain, § 12.42. It follows, then, that where, as appears to be the case here, the total award is inadequate to fully compensate both the lessee and lessor, the inadequacy, or loss, must be shared by both lessee and lessor according to their proportionate interests in the estate.
There is no evidence in the apportionment proceeding that the total award was made on the basis of the "highest and best use" of the land; and, accordingly, it would be unfair to allow Harco to use this basis for determining its own compensable interest as against Notsla. Therefore, the value of the leasehold was properly and fairly determined in this case by taking into account inflationary factors, fixtures and improvements, and any changes in the rental market bearing on valuation of the lease over and above the reserved rent, but without regard to any particular use. These factors appear to us to be fairly and adequately reflected in the Trial Court's determination of Harco's compensable interest at $19,500.
AFFIRMED.
FAULKNER, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.
TORBERT, C. J., concurs in the result.
MADDOX, J., dissents.
BLOODWORTH, J., not sitting.
MADDOX, Justice (dissenting).
I think the trial judge erroneously applied the law regarding the valuation of Harco's leasehold interest; therefore, I respectfully dissent, on basically the same grounds I expressed in my dissent in Shell Oil Company v. Guyton, 364 So.2d 292 (Ala. 1978). I recognize that the majority follows the rule of leasehold valuation first established by City of Dothan v. Wilkes, 269 Ala. 444, 114 So.2d 237 (1959), which was reenforced in Shell Oil Company, supra, but I think the majority fails to recognize that the rule is inequitable, if not unconstitutional, in that it allows a lessor to include a lessee's fixtures and improvements in determining the value of the condemned property, but deprives the holder of the leasehold from sharing in the award to the extent of the fair market value of his leasehold. As such, the apportionment formula adopted in this case deprives the lessee of the fair market value of his leasehold interest and constitutes a taking of his property without "just compensation" therefor, in violation of both our state and federal constitutions.
The majority justifies the application of the rule by comparing it to the carving up of a "chicken." The majority states that a *7 court, at the time of apportionment, sits "in the place of the head of the household who must superintend the carving up and distribution of a chicken which is really not big enough to go around . . .." If the rule produces that result, then I suggest that either the "chicken," that is, just compensation, was insufficient to cover the interest taken, or the lessee's "corn" was used to fatten the "chicken" and when it was carved up, he only got a drumstick. To state that there is insufficient "compensation" to pay each interest holder what was justly due him is to suggest the inequity, and the unconstitutionality, of the apportionment rule.
I believe this Court should adopt an approach to valuation as set out in Kizer, Valuation of Leasehold Estates and Eminent Domain, 67 W.Va.L.Rev. 101, 105 (1965).
NOTES
[1] It should be noted that the amount of the allocation is not contested by the lessee on appeal.
[2] Here, for example, it may be noted that the valuation of Harco's lease, with reference to its "highest and best use" as a drug store, yielded a valuation (alternatively, $55,220.30, $72,204.52, or $125,970.35) not too different from that which Harco might have asked had it intended to sell its business.
[3] The rationale for the general rule against compensation for business losses is given in 2 Nichols, The Law of Eminent Domain, 3d Ed., § 5.76 at 249-250:

"Under one theory, damage to a business is not considered compensable by virtue of the fact that neither the business nor its good will were taken. Since title to all property is held subject to the implied condition that it must be surrendered whenever the public interest requires it, the inconvenience and expense incident to the surrender of possession are not elements to be considered in determining the damages to which the owner is entitled.
"The second theory is that denial of compensation is based on the doctrine that damages to business or good-will are damnum absque injuria.
"The third theory is that business is less tangible in nature and more uncertain in its vicissitudes than the rights which the constitution undertakes to protect.
"The final theory adheres to the concept that such losses were not within the contemplation of the eminent domain clause of the constitution. Under the constitution compensation need not be made for purely personal property taken. Under such circumstances there is even less reason for allowing compensation for losses to personal property incidental to a change in location of a business."