[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 316 
The plaintiffs, Norman Barber, Brenda Barber, Wharfhouse Restaurant and Oyster Bar, Inc., and Ben Jernigan, appeal from a summary judgment for the defendants, the Alabama Department of Transportation ("the State") and McInnis Corporation ("McInnis"), in two consolidated actions for damages brought pursuant to Article I, § 23, and Article III, § 235, of the Alabama Constitution for a taking of, injury to, or destruction of private property for public use and for damages for tortious conduct. (One action was filed by Norman Barber, Brenda Barber, and Wharfhouse Restaurant and Oyster Bar, Inc.; the other action was filed by Ben Jernigan.) We affirm in part, reverse in part, and remand.
On a motion for a summary judgment, the burden is initially on the movant to make a prima facie showing that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. In order to defeat a movant's properly supported summary judgment motion, the nonmovant must present sufficient evidence to create a factual issue for resolution by the factfinder. On review of a summary judgment, this Court reviews the record in a light most favorable to the nonmovant and resolves all reasonable doubts against the movant. Blackburn v. State Farm Auto. Ins. Co., 652 So.2d 1140
(Ala. 1994).
On February 27, 1987, Brenda Barber purchased the Wharfhouse Restaurant and Oyster Bar ("the restaurant") and the land on which it is located. This waterfront restaurant, located in Mobile County, is primarily a wooden structure, supported by piles driven deep into the sandy soil. Brenda Barber's husband, Norman Barber, contributed funds toward the purchase of the property, and he joined his wife as a plaintiff; however, the record indicates that Brenda Barber was the sole purchaser.
On August 4, 1987, Brenda Barber transferred her ownership interest in the property to Wharfhouse Restaurant and Oyster Bar, Inc. ("the corporation"), which had been formed to assume the liabilities and operation of the restaurant. In March 1992, after Brenda Barber had learned that the State was planning to build a bridge on property adjacent to the restaurant property, the corporation leased the property to Ben Jernigan. Jernigan, who was also given an option to purchase the property, was aware when he entered into the lease that the construction of a bridge nearby was a possibility, although he believed, based on erroneous information he had received from a representative of the State, that construction would not begin soon. In fact, plans for construction were underway. The State ultimately contracted *Page 317 
with McInnis to build the bridge. McInnis contracted with P 
H Construction Company, Inc. ("the subcontractor"), to perform the initial pile-driving operations to form the footings for the placement of the bridge structure. The State required that the pile-driving operations conform to the project's plans and specifications. Construction of the bridge, including the installation of test piles, got underway in late 1992. The pile-driving operations subjected the restaurant to extensive vibration. Other construction activities also significantly hindered Jernigan's ability to operate the restaurant. By September 1994, Jernigan was forced to close the restaurant, and it has been vacant since.
The construction of the bridge, according to the plaintiffs, caused physical damage to the restaurant, the destruction of the restaurant as a viable business, and the diminution of the value of the property as a whole. The plaintiffs' claims against the State were based in part on allegations that the State had to compensate them under § 23 and § 235 of the Alabama Constitution for the "taking" of their respective property interests, and in part on allegations that the State was liable in damages for negligence or wantonness in connection with the construction of the bridge and on allegations that the State was liable for willful injury to their property interests.[1] The plaintiffs' claims against McInnis were based on allegations of negligent, wanton, or willful injury to the property. The plaintiffs requested a jury trial on each of their claims. The dispositive issue is whether there are any factual questions that must be resolved by a jury.
Initially, we note that the summary judgment for the State was proper as to the claims of Brenda and Norman Barber. An inverse condemnation action must be brought by the owner of the property affected or by someone with a property interest; in this case, that would have been the corporation (Wharfhouse Restaurant and Oyster Bar, Inc.) or Ben Jernigan. See State v.Woodham, 288 Ala. 608, 614, 264 So.2d 166, 171 (1972) ("The basic constitutional principle is that there must be an actual taking of property or property rights before compensation is required."); see, also, Ala. Code 1975, § 18-1A-3(6), part of the Alabama Eminent Domain Code (defining "condemnee" as [a] person who has or claims an interest in property that is the subject of a prospective or pending condemnation action"). We also note that § 235 of the Alabama Constitution requiresmunicipalities and other corporations "invested with the privilege of taking property for public use" to make "just compensation" for "property taken, injured, or destroyed by the construction or enlargement of its works, highways, or improvements," where there is evidence of some direct physical damage to the property. Jefferson County v. Southern NaturalGas Co., 621. So.2d 1282 (Ala. 1993). Section 235 does not apply to the State. Finnell v. Pitts, 222 Ala. 290, 132 So. 2
(1930). The summary judgment with respect to the plaintiffs' § 235 claims was, therefore, proper, and, in fact, the plaintiffs concede this in their briefs. Finally, it is well established that tort claims against the State, such as those made here (based on allegations of negligence, wantonness, and willfulness), are barred by the sovereign immunity granted under Article I, § 14, of the Alabama Constitution. SeeHutchinson v. Board of Trustees of University of Alabama,288 Ala. 20, 23, 256 So.2d 281, 283 (1971) (noting that "[t]his Court, construing Section 14, has held almost every conceivable type of suit to be within the constitutional prohibition"). For exceptions to the sovereign immunity doctrine, including the exception made for inverse condemnation actions against the State, see Williams v. Hank's Ambulance Service, Inc.,699 So.2d 1230 (Ala. 1997).
The principal argument of the plaintiffs (the corporation and Jernigan) is that they have valid claims against the State under § 23 of the Alabama Constitution. Section 23 provides in pertinent part that *Page 318 
"private property shall not be taken for, or applied to public use, unless just compensation be first made therefor." InForeman v. State, 676 So.2d 303 (Ala. 1995), this Court rejected the State's argument that there can be no "taking" within the meaning of § 23 unless the State actually occupies or engages in construction activities on the affected property. This Court, quoting Jefferson County v. Southern Natural Gas, supra, at 1287, stated: "[I]n inverse condemnation actions, a governmental authority need only occupy or injure the property in question." 676 So.2d at 305. (Emphasis in Foreman.) The State contends that there is insufficient evidence in the record from which a jury could reasonably find that the construction of the bridge caused compensable damage to the plaintiffs' property interests. After reviewing the record, we must disagree.
Ben Jernigan testified by deposition as follows:
 "The Affiant opened the Wharfhouse Restaurant under his lease on or about March 29, 1992, and for the months of March, April and May his restaurant stayed busy. In June of 1992, some grading work began on the construction site for the bridge replacement project although that grading work was far away from the restaurant at that time, resulting in no detrimental effect on the restaurant. The Affiant then constructed the walk-up bar and lower deck area and business remained relatively good until November 1992, at which time traffic on Dauphin Island Parkway was blocked and restricted to one (1) lane of traffic as the old road was removed, for the installation of sewage pipes or drainage for the new road and the new bridge. In November of 1992, heavy earth moving equipment began operation on the construction site in and around the area of the Wharfhouse Restaurant causing the building to sway during such earth movement. In November of 1992, State Department of Transportation trucks began parking on the Wharfhouse Restaurant parking areas. In January of 1993 there were power outages caused by the construction project and in January of 1993 the parking lot was flooded on one (1) or two (2) occasions due to the change in elevation of the new service road and diversion of waters from the bridge project onto the Wharfhouse Restaurant parking lot. In February of 1993, there was a broken water line which was caused during the construction of the new bridge. As a result, there was no water to the Affiant's restaurant from 4:00 p.m. to 10:00 p.m., on a Friday night, which is the busiest time of the week for the restaurant. On February 26, 1993, sewage pipes were deposited on the Affiant's restaurant parking area by the general contractor, without authority, so there was less parking for his customers. On March 6, 1993, pile driving was commenced,[2] at which time the restaurant building began to shake, glasses and bottles began to rattle, exhaust fumes and noise were extremely bad and obnoxious, construction workers' cars were blocking the restaurant's driveway, and pile driver and bridge construction employees were cat calling, whistling at and harassing the restaurant's waitresses and female customers. On March 9, 1993, customers complained about construction fumes, noise and debris as they attempted to eat on the outside decks of the Wharfhouse Restaurant which was impossible due to the noise, smell and vibration caused by the bridge construction. . . . In April and May of 1993, problems continued as construction activities continued in the area of the restaurant, pile driving activities went on from early morning to late evening, sometimes well after 5:00 p.m., causing the deck and restaurant to shake, the restaurant's parking area was flooded, crude remarks were continued to be made to the restaurant staff and female customers, all causing general interference with the normal business operations of the restaurant.
 "In June of 1993, the telephone lines to the restaurant were again cut by construction crews, water lines were again cut on occasion, red clay was again diverted from the construction site onto the restaurant parking lot, many employees from the construction *Page 319 
site still parked in the Wharfhouse Restaurant parking area, all without the Affiant's authority. From the period between June through December of 1993, many customers were completely blocked from access to the restaurant by the construction activities, water continued to be diverted from the construction site onto the restaurant property, access to the restaurant continued to be diverted as there was no direct access at any point to Dauphin Island Parkway as the bridge project was carried out. The building and deck continued to rock, roll and shake due to the pile driving and construction activities, customers began to complain and gradually began to just not come to the Affiant's restaurant. During this time restaurant business fell off drastically.
 "All of the aforementioned interferences with the Affiant's business were brought to the attention of McInnis and State Department of Transportation personnel although no efforts were made to alleviate or correct such problems.
 "In January and February of 1994, traffic was blocked at the restaurant as construction activities on the bridge were then within fifty (50) to seventy (75) feet of the front door of the restaurant. Construction workers continued to park on Wharfhouse property, without authorization, they threw trash on the restaurant property, continued to block access to and from the restaurant for its staff and customers, blocked access to the restaurant dumpster, heavy equipment continued to be parked in and around the restaurant premises, pile driving activities were within fifty (50) feet of the front door releasing smoke, obnoxious odors and debris onto the restaurant premises and customers, and concrete was even spilled and splattered onto the restaurant facility and staff automobiles, water lines were again damaged, and electrical service to the restaurant was again interrupted. This state of affairs continued in March of 1994 as a crane blocked the entrance to the restaurant on occasion, debris was flying off of the bridge, to include plastic sheets and 55 gallon drums, onto the restaurant premises. During this time traffic continued to be completely blocked and restricted on occasion. The Affiant received many calls from customers indicating they could not get to the restaurant and, when they were allowed to gain access, they complained to the Affiant of fumes, noise and vibration of the building caused by the construction activities.
". . . .
 "During April and May of 1994, pilings were being driven in close proximity to the restaurant blocking the entrance to the restaurant, causing noise, smoke, smell, and debris to be deposited on the restaurant premises, shaking of the building and flooding the parking lot. Water was being pumped by the general contractor, from the construction site, across the restaurant premises, and into Mobile Bay. Heavy equipment constantly blocked the entrance of the Wharfhouse Restaurant. The Affiant continued to complain to the State Department of Transportation representatives and to McInnis, to no avail.
 "In May of 1994, the Affiant put signs up in his restaurant parking lot indicating no parking for construction personnel, parking spaces were only provided for restaurant customers. That did no good as the parking lot continued to be used by bridge construction employees and State Department of Transportation employees and the restaurant entrance continued to be blocked. On June 13 and 14, 1994, the vibrating of the building reached one of its worst levels as customers actually left the building due to the shaking of the building. Water in the aquarium in the restaurant bar was shaking violently and sloshing. On June 3, 10 and 15, 1994, pile drivers caught on fire, all within a few feet of the restaurant, causing smoke, fumes and debris to be deposited on the restaurant premises. On June 20, 1994, there was no way in or out of the restaurant at all as access to and from the restaurant was completely blocked. The restaurant was able to get no deliveries from its vendors, and the general contractor employees became angry when asked to allow restaurant staff, supplies and customers access.
 "During the month of June, 1994, there were many announcements on the local *Page 320 
news and radio that the Dog River bridge area should be avoided due to the new bridge construction activities and that the road had been closed. This obviously interfered with the Affiant's restaurant business and reputation as many customers heard those broadcasts and refused to come to the restaurant. During the months of July and August, 1994, heavy equipment continued to block access to the restaurant. The area around the restaurant basically looked like a 'war zone' as concrete trucks and cranes continued to block driveways, mud and construction debris was everywhere, and the restaurant building continued to rock and roll as pile driving continued.
 "During the month of September, 1994, the restaurant driveway was dug up by construction employees so the restaurant had no entrance or exit, at all. The new service road which was installed to provide access to the restaurant, provided safe access only to southbound traffic, from the West and then under the bridge, and the entrance to that new service road was approximately 1/2 mile North of the Wharfhouse Restaurant. But before that, the restaurant had access, on grade, directly off Dauphin Island Parkway, to both northbound and southbound traffic. The new bridge, as constructed, was some fifty (50) to sixty (60) feet above the Affiant's restaurant. This large concrete structure of the new bridge looms almost directly over the restaurant. During September of 1994, the telephone lines continued to be cut, electrical power continued to be cut, and on September 23, 1994, after having complained to McInnis Corporation and to the State Department of Transportation for almost two (2) years, the Affiant was forced to close his restaurant business, as a direct result of loss of customers and revenue which he attributes to the construction of the new bridge, and due to the method of such construction, and the total lack of attention to his restaurant's needs by the State Department of Transportation and McInnis Corporation. . . .
 "As a result of the lack of response to his complaints by the State Department of Transportation and McInnis Corporation, the Affiant lost not only his investment in the building, as he had spent some $50,000 to $60,000 in improvements thereto, but he also lost the right to purchase the restaurant property, as he had an option to purchase such property under the lease, plus he lost almost two (2) years of time, effort and money which he invested in the restaurant project. The bridge construction activities basically strangled the operation of the Wharfhouse Restaurant business as customers would not return and face the traffic congestion, noise, debris, smoke, smell, vibrations, and mud, as well as lack of access, all caused by the bridge replacement project itself, and as caused by actions of the bridge contractor, McInnis Corporation."
Joe Lamar, a retired employee of the Mobile District of the Corps of Engineers, who had experience in determining the effect of vibrations on soil, testified by deposition:
 "Q. What did you do when you were down there on January 2nd?
 "A. Well, I looked at the structure, looked at what was damaged to it to the extent that I could see the walls were cracked, ceiling was cracked. Up in the roof the roof was pulled apart. It was leaking badly. There were cracked windows. [In the] deck area to the south the piling had come up and the water was draining from the outside to the building itself. There was some boards pulled loose. Whether those particular boards had anything to do with the pile driving, I don't know. They could have.
". . . .
"Q. But did you come to that —
 "A. The work done on construction of the bridge caused the damage to the Wharfhouse Restaurant.
". . . .
 "Q. Then the next word you have on here is 'settlement'?
"A. 'Settlement'?
"Q. 'Settlement' that you wrote on your note.
 "A. Yes. I was writing my notes to consider this, consider settlement. In vibrating *Page 321 
those soils they could densify it and you would get some settlement, but the settlement in itself is not significant. I was just touching bases in that; consider this, consider this, consider this, consider this. . . .
"Q. You've ruled out settlement now?
 "A. I've ruled out settlement as a factor that contributes to damage of the building.
 "Q. And the next word you have written down here is 'fatigue.'
". . . .
"A. 'Fatigue.' Yes.
"Q. Yes, 'fatigue.'
 "A. You could — you've got a pile driver driving a pile, wham, wham, wham, 43 times a minute, maybe 50 times a minute. It goes on for 30 minutes or an hour, two or three hours. As a matter of fact, they beat on it so long that they set the cushioning on fire. And I've had that happen many times. . . .
 "If you are beating that building and it vibrates, one time don't hurt it. But if you do it again and again and again and again, it's going to start pulling apart. And that's fatigue.
 "Q. . . . Do you have an opinion now about what's caused this damage to the Wharfhouse Restaurant you described to us when we first started out this morning?
". . . .
 "A. Yes, sir. My opinion is the damage to the Wharfhouse Restaurant was caused primarily by the pile driving.
"Q. Were there some secondary causes?
 "A. There could — the secondary causes could be — would be vibration of heavy equipment handling the pile.
 "Q. And as I understand your testimony here today, what you've told us is you have an opinion — it is your opinion that there was some structural damage to the Wharfhouse Restaurant that was caused by primarily pile driving?
 "A. Yes, sir, due to — we were going through those calculations while ago peak values that exceed the level for damage to buildings."
Although he expressed no opinion as to whether the pile-driving operations had actually damaged the restaurant, Bill Phillips, an architect, stated in his deposition that it was his opinion that the damage to the restaurant could have been caused by the kind of pile-driving operations that were conducted by the State:
 "Q. Can you think of anything that I haven't asked you about that you may have covered with them?
 "A. Yes. They asked me about potential detrimental effect on the building caused by the construction of the bridge, which is something that you may have addressed peripherally, but you haven't addressed directly.
 "Q. Is that a professional opinion or a fact as far as you are concerned?
 "A. I think that we are asking it — I think they were asking it more as an opinion thing because I am not a structural engineer and I don't claim to be one. But I have been in this business approaching 30 years now. And they asked me what I felt the effects of that construction of that bridge could be. And I told them what I thought.
"Q. What did you tell them?
 "A. It's been my experience that if you have a stable structure it will tend to remain stable, if it is stable, until an outside force acts upon it. I considered the construction of the bridge to involve outside forces acting upon that building. I also live, was born and raised in Mobile, although I lived away for a while. Any time you start fooling with earth around here, you can have some problems. That's the reason why one of the things I did was to check to see if test points had been made early on. Once those pilings are in place, if those pilings were not disturbed, with the history of the building, one would assume that they would remain. But if much force was added to them, applied to them — and I don't know that, I made that assumption. But if a force was applied through hammering or driving pilings, which I know occurred in that soil, it would *Page 322 
have a tendency to displace the soil. And if it did displace it, it can change the characteristics of the soil, at least it could when I studied soils a long time [sic]. But again, my concern was that there might have been some displacement of the soil that could cause a problem. I didn't look at the building. I don't know if it did. But they asked me the question about what could occur, and that could occur.
 "Q. So all you know is that the pilings were driven but you don't know if anything resulted from the pilings being driven?
"A. No, sir, I do not.
 "Q. And you have not been asked to give an opinion about that sort of thing, about the displacement of the soils in this case, have you?
 "A. I mean, that's not my understanding. They asked me about it that day and I gave my opinion. And if they ask me about it again, I would still give that opinion."
The record also contains two reports and an internal memorandum prepared by Clark, Geer, Latham, Associates, Inc., an engineering firm that Jernigan hired to conduct a structural investigation of the restaurant. These documents indicate that the restaurant began to show signs of structural stress (cracks, leaks) after the construction on the bridge was commenced. One report, dated August 16, 1993, states: "Based on our new survey, the restaurant has experienced differential movements varying from 1/2" to 3/4" which appears to have primarily occurred in the south portion of the structure."
Based on the above, we conclude that sufficient evidence was presented to create factual questions for a jury as to whether the restaurant was physically damaged as a result of the construction of the bridge, and, if so, to what extent, and as to whether the bridge construction caused the restaurant to go out of business. Compensation in a condemnation proceeding, where, as here, only a part of the property is "taken" (damaged) for a public purpose, is computed by taking the difference between the fair market value of the entire parcel immediately before the "taking" (damage) and the value of the part remaining after the "taking" (damage). State v. Woodham, supra. It is the generally accepted rule that insofar as a building adds to the fair market value of the land, it must be considered in determining the amount of compensation owed.State v. Woodham. This Court has held that unless otherwise provided by statute, the loss of a business, as such, is not compensable in condemnation proceedings[3]; however, the existence of a business is a factor to be considered in determining the highest and best use of the land upon which it is conducted.State v. Woodham, 288 Ala. at 610-11, 264 So.2d at 168; HarcoDrug, Inc. v. Notsla, Inc., 382 So.2d 1 (Ala. 1980) (noting that although loss of a business is not compensable, income derived from a business on the condemned property is nonetheless a factor that may be considered in arriving at the fair market value of the land). In State v. Atkins, 439 So.2d 128, 131
(Ala. 1983), this Court noted that "[i]n determining the fair market value of a parcel taken by eminent domain, consideration should be given to any factors which a reasonably prudent buyer would consider before purchasing the property."
Based on the above, we conclude that the summary judgment was improper with respect to the plaintiffs' inverse condemnation claims against the State under § 23 of the Alabama Constitution. Sufficient evidence was presented to allow a jury to determine whether the construction of the bridge damaged the restaurant and otherwise diminished the fair market value of the property and, if so, to determine the amount of "just compensation" due for that damage. The compensation, if any, awarded by the jury should be allocated between the owner *Page 323 
(the corporation) and the lessee (Jernigan) in accordance with the "undivided fee rule," which was discussed in Harco Drug,Inc. v. Notsla, Inc., supra, 382 So.2d at 5:
 "In all cases where property taken for public use is in multiple ownership, each of the owners of an interest in the property has a corresponding right to share in the award. The award is thus apportioned in accordance with the respective interests of such owners. 4 Nichols, The Law of Eminent Domain, § 12.42. Where the multiple estate consists of a lessor and a lessee, compensation is due the lessor for damage to his reversionary interest, and to the lessee for damage to his leasehold. 4 Nichols, The Law of Eminent Domain, § 12.42(l).
". . . .
 "The 'undivided fee rule' is stated in City of Dothan v. Wilkes, 269 Ala. 444, 114 So.2d 237
(1959), as follows:
 " '[W]here there are several interests or estates in a tract of land taken by eminent domain, the proper method of fixing the value of or damage to each interest or estate is to determine the value of or damage to the interests as a whole and then to apportion the gross award among the several owners according to their respective interests.' 269 Ala. at 447, 114 So.2d at 240.
 "The rule is elaborated upon in 4 Nichols, The Law of Eminent Domain, 3d Ed., § 12.36(1), at 685ff., as follows:
 " 'It was formerly looked upon as one of the most firmly established principles of law of eminent domain, and it is still the law in the usual case, that when a tract of land is taken by eminent domain, as the land itself is taken by a paramount title rather than the separate estates of different persons having interests in the land, the compensation awarded is for the land itself, and not for the sum of the different interests therein. The duty of the public to make payment for the property which it has taken is not, it is said, affected by the nature of the title or by the diversity of interests in the property. The public pays what the land is worth, and lets the amount so paid be divided among the various claimants, according to the nature of their respective estates.' "
The plaintiffs' claims against McInnis were based on allegations that McInnis had acted negligently or wantonly in certain aspects of its construction activities, that those activities had proximately caused damage to the property, and that McInnis had willfully damaged the property. After carefully reviewing the record, we conclude that because Brenda Barber and Norman Barber owned no interest in the property, the summary judgment was proper with respect to their tort claims against McInnis. We also conclude that there was insufficient evidence to submit the corporation and Jernigan's willfulness claims to a jury and, therefore, that the summary judgment was proper as to those claims. We further conclude that there was insufficient evidence to submit the negligence and wantonness claims to a jury, to the extent that those claims were based on damage that may have been done to the property by the pile-driving operations performed by the subcontractor. The undisputed evidence indicates that the pile-driving conformed to generally accepted pile-driving practices. Even the plaintiffs' soil expert, Joe Lamar, agreed that the pile-driving was not negligently performed:
 "Q. You don't have any criticisms as to the manner and method of the pile driving itself on the bridge construction, do you?
". . . .
"A. No, no, no.
 "Q. You don't criticize the manner and method in which the pile driving was done?
 "A. That's the only way you can build a bridge. You can't build it with some other kind of weaker pile. They just had to do it that way."
Accordingly, the summary judgment was also proper with respect to the claims based on allegations of negligence or wantonness in connection with the pile-driving.
However, we cannot say that there was insufficient evidence of negligence or wantonness on McInnis's part with respect to other construction activities. As noted above, Jernigan testified in his affidavit *Page 324 
that McInnis had periodically cut off utility service to his restaurant (i.e., electric, water, and telephone service); that water and mud had been diverted from the construction site onto the restaurant's parking area; that McInnis's employees had repeatedly parked their vehicles in the restaurant parking area, using valuable customer parking space; that McInnis had deposited construction materials, garbage, and other debris onto the restaurant property; that McInnis had repeatedly blocked access to the restaurant during the restaurant's business hours; and that McInnis had dug up the only driveway providing access to the restaurant and had diverted customer traffic onto a newly built service road that provided only limited access from the main road, Dauphin Island Parkway. We consider this evidence sufficient to present a jury question as to whether McInnis acted with reasonable care in its construction of the bridge and, if not, whether the failure to do so proximately caused damage to the plaintiffs. Furthermore, we view Jernigan's testimony that he had repeatedly called McInnis's attention to many of these problems to be sufficient to allow a jury to consider the plaintiffs' wantonness claims.
For the foregoing reasons, the summary judgment for the State and McInnis is affirmed in part and reversed in part and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and KENNEDY, COOK, and SEE, JJ., concur.
[1] We note that the plaintiffs did not sue the subcontractor. McInnis filed a third-party complaint against the subcontractor, seeking indemnification in the event it was held liable to the plaintiffs for damage caused by the pile-driving operations. The trial court also entered a summary judgment for the subcontractor.
[2] As previously noted, other evidence indicates that installation of test piles began in late 1992.
[3] Section 18-1A-32(b), provides:
 "The judgment and any settlement in an inverse condemnation action awarding or allowing compensation to the plaintiff for the taking or damaging of property by a condemnor shall include the plaintiffs' litigation expenses.
 Contrary to the plaintiffs' assertions, we do not view this provision as a clear legislative authorization for the direct recovery of damages for the loss of a business.